# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FREDERICK BANKS, | Civil Action No. 13 – 1199 |
| Plaintiff, | |
| v. | District Judge Nora Barry Fischer |
| | Chief Magistrate Judge Lisa Pupo Lenihan |
| UNITED STATES PROBATION DEPARTMENT FOR THE WESTERN DISTRICT OF PENNSYLVANIA, US DEPARTMENT OF JUSTICE CIVIL LITIGATION UNIT, and MIKE DOYLE, *Congressman*, | |
| Defendants. | |

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

For the following reasons, it is respectfully recommended that Plaintiff's Complaint for Writ of Mandamus be dismissed for lack of subject matter jurisdiction.

**II.    REPORT**

   **A. Background**

Plaintiff, Frederick Banks, commenced this lawsuit in the Middle District of Pennsylvania on August 2, 2013. He submitted for filing a Complaint for Writ of Mandamus accompanied by a Motion for Leave to Proceed *in forma pauperis*. That motion was granted and this action was transferred to this Court on August 21, 2013.

Plaintiff alleges that the United States Probation Department for the Western District of Pennsylvania improperly denied his request to apply for grant and loan money under the Second

1

Chance Act and with the Urban Redevelopment Association ("URA") so that he could make necessary repairs to his home. Because he is an American Indian, he claims that this was in violation of his rights under the Sioux Treaty of Fort Laramie of 1868 and the Northwest Ordinance of 1787. He seeks damages in the amount of $314,000 and an Order directing the United States Probation Office to allow Plaintiff to apply for the aforementioned loans and grants.

### B. Treaty of Fort Laramie

Plaintiff moves the Court for relief pursuant to the Treaty of Fort Laramie of April 29, 1868, 15 Stat. 635. This is not the first time that Plaintiff has brought suit for violations of his rights under this treaty. However, from the Court's research, it appears that the treaty has never been fully explained to Plaintiff in any of its prior Opinions.[1] While the treaty itself is somewhat antiquated, the Court directs Plaintiff's attention to United States v. Sioux Nation of Indians, 448 U.S. 371, 374-84 (1980), where the Supreme Court set forth a comprehensive, yet understandable explanation of its history and contents. To summarize, the treaty established the Great Sioux Reservation, which comprised most of what is now western South Dakota and part of North Dakota, and the United States pledged that the reservation would be set apart for the "absolute and undisturbed use and occupation" of Sioux tribes. The United States also solemnly agreed that no unauthorized persons would "ever be permitted to pass over, settle upon, or reside in" the reservation territory. Members of the Sioux tribes were permitted to select lands within the reservation for cultivation, and in order to assist the Sioux in becoming civilized farmers, the Government promised to provide them with the necessary services and materials, and with

---

[1] Plaintiff is a long-time frequent filer in this Court as well as other federal courts within the Third Circuit and until recently he was a federal prisoner. While he is not currently in custody at this time, pursuant to 28 U.S.C. § 1915(g), he is barred from bringing a civil action *in forma pauperis* as a prisoner unless he is under imminent danger of serious physical injury.

subsistence rations for four years. In exchange for the benefits conferred by the treaty, the Sioux agreed to relinquish their rights under the Treaty of September 17, 1851, to occupy territories outside the reservation, and agreed to withdraw all opposition to the building of railroads that did not pass over their reservation lands, not to engage in attacks on settlers, and to withdraw their opposition to the military posts and roads that had been established south of the North Platte River. *See* Sioux Nation of Indians, 448 U.S. at 374-84.

**C. Discussion**

Plaintiff states that he is an American Indian and that the United States breached its contractual duty to assist him in bridging the gap into society when they would not allow him to apply for loan and grant money that is available to him through the URA[2] and the Second Chance Act.[3] He states that Defendants violated his rights under the Treaty of Fort Laramie of 1868 and the Northwest Ordinance of 1787[4] and he seeks an order compelling the United States Probation Office for the Western District of Pennsylvania to allow him to apply for these loans and grants so he can repair his roof and have his light, heat and water restored.

---

[2] According to its website, the "Urban Redevelopment Authority (URA) of Pittsburgh is the City of Pittsburgh's economic development agency, committed to creating jobs, expanding the City's tax base and improving the vitality of businesses and neighborhoods. The URA achieves this mission by assembling, preparing and conveying sites for major mixed-use developments; and by providing a portfolio of programs that include financing for business location, relocation and expansion, housing construction and rehabilitation, and home purchases and improvements." http://www.ura.org/ (last visited on August 28, 2013).

[3] The Second Chance Act was signed into law by President Bush on April 9, 2008. Its purpose is to help ensure that the transition from prison to jail to the community is safe and successful. https://www.bja.gov/ProgramDetails.aspx?Program_ID=90 (last visited on August 28, 2013).

[4] The Northwest Ordinance was adopted by the Confederation Congress on July 13, 1787. Also known as the Ordinance of 1787, the Northwest Ordinance established a government for the Northwest Territory, outlined the process for admitting a new state to the Union, and guaranteed that newly created states would be equal to the original thirteen states. The Northwest Ordinance also protected civil liberties and outlawed slavery in the new territories. http://loc.gov/rr/program/bib/ourdocs/northwest.html (last visited on August 28, 2013). However, the Supreme Court has held that the Northwest Ordinance has been superseded by the constitutions of those states, which were originally part of the Northwest Territory and therefore it does not provide Plaintiff with a basis for seeking relief in this Court. Brown v. Mueller, 1997 U.S. Dist. LEXIS 12102, at *20-21 (E.D. Mich. June 24, 1997) (citing Sands v. Manistee River Improvement Company, 123 U.S. 288, 295-96 (1887)).

Plaintiff appears to invoke the so-called "bad men" provision in Article I of the Treaty of Fort Laramie, which provides in relevant part that:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Fort Laramie Treaty art. I, April 29, 1868, 15 Stat. 635. Plaintiff appears to suggest that this provision provides a private right of action for individual Indians and mandates the payment of money damages pursuant to the term "reimburse."

Article I "bad men" provisions appear in substantially similar form in nine treaties between United States and Indian tribes. Tsosie v. United States, 825 F.2d 393, 395 (Fed. Cir. 1987) (Tsosie II); Brown v. United States, 32 Ct. Cl. 432, 435, 1800 WL 2115 (1897); *see*, *e.g.*, Begay v. United States, 219 Ct. Cl. 599, 600 (1979) (Begay I) ("bad men" provision in Treaty between the United States and the Navajo tribes); Hebah v. United States, 428 F.2d 1334, 1335 (1970) (Hebah I) ("bad men" provision in Treaty between the United States and the Eastern Band of Shoshonees and the Bannack Tribe). Each of the Indian treaties, in fact, contains two "bad men" clauses. Tsosie II at 398. In addition to the one quoted above ("white 'bad men' provision"), which provides a remedy for wrongs committed by white men against Indians, there is another "bad men" clause which provides relief for wrongs committed by Indians ("Indian 'bad men' provision"). The Indian "bad men" provision reads as follows:

> If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States, and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws; and in case they willfully refuse so to do, the person injured shall be

> reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States.

Fort Laramie Treaty art. I, April 29, 1868, 15 Stat. 635. The primary object of this provision was to require the Indians to deliver up wrongdoers for trial and punishment under the laws of the United States and, if the Indians failed to do so, to allow the injured person to be compensated for his loss. Friend v. United States, 29 Ct. Cl. 425, 429, 1800 WL 1867 (1894). Together, the purpose served by the two "bad men" provisions working in concert was to keep the peace between the white men and the Indians. Janis v. United States, 32 Ct. Cl. 407, 410, 1800 WL 2111 (1897). As stated by the Federal Circuit Court of Appeals, the "bad men" clause was a pact "between two nations, and each one promised redress for wrongs committed by its nationals against those of the other nation." Richard v. United States, 677 F.3d 1141, 1148 (Fed. Cir. 2012). As the Court of Federal Claims has explained, it would seem that the "primary intent of both 'bad men' provisions was to guard against affirmative criminal acts, primarily murder, assault, and theft of property." Garreaux v. United States, 77 Fed. Cl. 726, 736 (2007).

A treaty with a Native American tribe is a contract, Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675 (1979), and the "bad men" clause gives Native Americans a right to seek redress directly from the United States for wrongs that are perpetrated by United States citizens against a tribe member while on tribal land. *See* Richard v. United States, 677 F.3d 1141, 1153 (2012). Although it appears that Plaintiff has failed to allege a plausible claim under the "bad men" clause,[5] the Court declines to decide that

---
[5] Plaintiff has not alleged that he is an enrolled member of the Sioux tribe, that he was even residing on a Sioux reservation, or that the "wrong" alleged occurred within a Sioux reservation. *See* Pablo v. United States, 98 Fed. Cl. 376 (2011) (government not required to reimburse an Indian for injuries from a sexual assault by a federal agent under the Fort Sumner Treaty since the treaty provided protection to Indians residing on the reservation, and where the injured Indian resided and where the assault occurred was not the reservation). Indeed, Plaintiff admits that he is

question as this Court does not have jurisdiction over Plaintiff's claim for the alleged violations of the Treaty of Fort Laramie. Because he is seeking damages in excess of $10,000, it appears as though jurisdiction lies exclusively with the United States Court of Federal Claims pursuant to the Tucker Act. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). Therefore, the Court should dismiss Plaintiff's Complaint for lack of subject matter jurisdiction, albeit without prejudice to his right to seek relief in that court.

## III. CONCLUSION

For the reasons set forth above, it is respectfully recommended that Plaintiff's Complaint for Writ of Mandamus be dismissed for lack of subject matter jurisdiction.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: August 29 , 2013

_____
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Frederick Banks
P.O. Box 42303
Pittsburgh, PA 15203
*Via U.S. Postal Mail*

---

residing within the city limits of Pittsburgh. Moreover, the "wrong" alleged in this case is not the type of wrong of which courts have found to have been contemplated within the meaning of the treaty